United States District Court
Southern District of Texas
FILED

MAY 19 2014

Clerk of Court

Approved: _____
JOHN P. COLLINS, JR.
Assistant United States Attorney

Before: HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

M-14-981-M

------------------------------- x

UNITED STATES OF AMERICA

- v. -

JUVENCIO MARTINEZ-MARTINEZ,
    a/k/a "Raul,"

            Defendant.

------------------------------- x

COMPLAINT

Violation of
18 U.S.C. Section 1203
18 U.S.C. Section 371

COUNTY OF OFFENSE:
SULLIVAN

SOUTHERN DISTRICT OF NEW YORK, ss.:

LYONEL MYRTHIL, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE

1.  From in or about late March 2014 through on or about May 15, 2014, in the Southern District of New York and elsewhere, JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," the defendant, knowingly seized and detained and threatened to kill, to injure and to continue to detain another person in order to compel a third person to do and abstain from doing an act as an explicit and implicit condition for the release of the person detained, and attempted and conspired to do so, to wit, JUVENCIO MARTINEZ-MARTINEZ and other individuals detained four individuals in a residence in or about Weslaco, Texas and threatened to kill, injure and detain one of the individuals in order to compel a person residing in Fallsburg, New York to send him money via Money Gram.

(Title 18, United States Code, Section 1203.)

## COUNT TWO

2. From in or about late March 2014 through on or about May 15, 2014, in the Southern District of New York and elsewhere, JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," the defendant, defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other, to commit offenses against the United States, to wit, a violation of Title 8, United States Code, Section 1324(a)(1)(A)(1).

3. It was a part and object of the conspiracy that JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," and others known and unknown, would and did knowingly bring to the United States an alien knowing that said person was an alien, at a place other than as designated by the Secretary of Homeland Security, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(i).

## OVERT ACT

4. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

    a. In or about May 2014, JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," the defendant, called an individual located in Fallsburg, New York and demanded that the individual pay MARTINEZ-MARTINEZ money in order to transport a foreign national from Texas.

(Title 8, United States Code, Section 1324(a)(1)(A)(i).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

2. I am a Special Agent with Federal Bureau of Investigation ("FBI"). I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, conversations I have had with other law enforcement officers who have also participated in the investigation, my review of documents and reports, my training and experience. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included the details of every aspect of the

investigation. Where actions, conversations, statements of others, and contents of documents, are related herein, they are related in substance and in part, except where otherwise indicated.

    3.    I have spoken to other law enforcement agents who have spoken to an individual who resides in Fallsburg, New York (the "Victim's mother"). The Victim's mother has informed law enforcement officers that:

    a. On or about May 13, 2014, the Victim's mother attempted to send a money gram wire transfer of $1,500, to a "Jose Gabriel Merida Lopez" in McAllen Texas. Money Gram, contacted the Victim's mother. The Victim's mother stated that her daughter (the "Victim") had been kidnapped near the Mexico/Texas border. The agent from Money Gram then contacted Fallsburg Police Department.

    b. The Victim, who is a citizen of El Salvador, left El Salvador on or about March 27, 2104. The Victim left with a woman who identified herself as "Roxana." The Victim was advised that it would cost her $4,000 in order for "Roxana" to bring her to the United States. The Victim was able to provide a down payment of $2,000 to "Roxana" and the Victim began her journey to the United States border.

    c. On or about April 5, 2014, "Roxana" contacted the Victim and her husband and advised that she and the Victim had arrived in Mexico. "Roxana" requested that the Victim's family wire $100 in order to purchase supplies. They were about to begin a two day journey and would require food and water for this journey. The Victim's mother wired the money on or about April 5, 2014 to a "Roxana Isabel Rivera Ramirez."

    d. On or about April 8, 2014, "Roxana" called and advised that they had made it to the top of Mexico but would require more money to cross the border. "Roxana" advised that it would cost $3500 to cross into the United States. The Victim stated that she had gotten $500 from her boyfriend and only needed her mother and

father to send $1,000. The Victim stated that she would be able to speak to the people bringing her across the border about paying off the balance once across. The Victim's mother then wired $1,000 to a "Noe Adrian Gomez Segundo" which was the name that "Roxana" had provided. The money was wired to the Federal District, Mexico. At this point, "Roxana" took the Victim's cellular telephone and advised the Victim that she would mail the phone to the Victim's mother. The Victim's mother never received her daughter's cell phone.

e. On or about April 19, 2014, the Victim's mother received a phone call from a man who identified himself as "Gustavo." He called and told the Victim's mother that her daughter was in McAllen, Texas. The Victim's mother did not believe this was true because she had received a Facebook message purporting to be from her daughter stating that she was in Weslaco, Texas. "Gustavo" indicated that he was in Mexico and the Victim was in McAllen, Texas.

f. On or about May 9, 2014, the Victim's mother received a phone call from an individual who identified himself as "Marcos." The Victim's mother was able to speak with her daughter and confirm that she was still alive. "Marco" had indicated that he had removed her daughter from the "Bodega." The Victim's mother understood "Bodega" to be a term used for the stash house where illegal immigrants are held until their smuggling fees are paid. "Marcos" stated that the Victim had not eaten in days, and he removed her in order to feed her and provide her with fresh clothing. "Marcos" stated to the Victim's mother that if she sent him $1,500, he would release her. He also gave the Victim's mother the option of sending $500, and the Victim could work off the balance. He stated that if he returned her to the "Bodega" the fee for her release could be significantly higher.

g. Over the course of the next few days, "Marcos" was continuously calling the Victim's mother to

4

    see if she had raised the funds. He stated that if she sent $600, he could get the Victim a job down there – meaning Texas -- and she could live there.

h. On or about May 12, 2014, the Victim's mother called "Marcos" to see if "Marcos" could get her daughter to Houston and how much it would cost. "Marcos" demanded a fee of $1800 to bring the Victim to Houston. The Victim's mother indicated that she did not have that much money and "Marcos" became annoyed. "Marcos" advised her that he would just return her to the "Bodega" and the people in charge there would begin sending her daughter to her in pieces.

i. On or about May 13, 2014, out of fear that her daughter would be harmed, the Victim's mother attempted to send $1500 to a name provided to her by "Marcos." The name was "Jose Gabriel Merida Lopez." The transfer was sent to McAllen, Texas.

j. On or about May 13, 2014, the Victim's mother received a phone call from an individual "Raul." "Raul" indicated that the Victim was with him and was inquiring about the money needed to release the Victim.

k. On or about May 14, 2014, the Victim called the Victim's mother and inquired if she had gotten the money together in order for her to be released. The Victim's mother told her daughter that she was trying to get the money together.

    4. On or about May 15, 2014, an Investigator with the New York State Police who is member of the FBI Hudson Valley Safe Streets Task Force and fluent in Spanish (the "Investigator"), monitored a call between "Raul" and the Victim's mother. During the call, "Raul" indicated that the Victim was in the house with his wife. He stated that he would have her call the Victim's mother back in an hour or so.

    5. Later, the Victim called back. During a call monitored by the Investigator, the Victim's mother utilized a

list of prepared questions. In response, the Victim stated, among other things, that: (1) she was staying in a Beige trailer behind a "pinkish" colored house; (2) there were other people inside of the house, a/k/a "Bodega"; (3) people had been coming and leaving from the house and that as many as nine people had left two days prior. "Raul" stated that he would just release the Victim in Weslaco, Texas, for $1500. He stated that he would transport her to Houston for $2,000.

      6. On or about May 15, 2014, law enforcement officers contacted with Money Gram Corporate office and learned that the $1500 the Victim's mother attempted to send on May 13, 2014 was still available because the funds had never been released. They were requested to check their system for a telephone number of "Raul" and they advised that a "JUVENCIO Martinez Martinez" was the name associated with that telephone number based upon their records. They also advised that eleven out of his twelve transactions were all made at a Wal-Mart on Texas Boulevard Weslaco, Texas.

      7. On May 15, 2014, the Investigator monitored another telephone call between "Raul" and the Victim's mother. The Victim's mother advised him that she had $1500 and needed to know where to wire the money. He advised her to wire the money to Weslaco, Texas, to the name "JUVENCIO Martinez Martinez."

      8. On or about May 15, 2014, FBI Special Agents and Task Force Officers in Texas took up surveillance positions at the Walmart on Texas Blvd, Weslaco, Texas.

      9. On or about May 15, 2014, law enforcement officers contacted Money Gram and requested that Money Gram make the funds available for "Juvencio Martinez Martinez". Money Gram provided law enforcement with a PIN number required to obtain the funds.

      10. Later, during a monitored phone call, the Victim's mother contacted "Raul" again and advised him that she had wired the money. "Raul" had indicated that there was a Wal-Mart nearby his location and he would release the Victim there. "Raul" requested that the Victim's mother text him the PIN number for the funds. At the direction of law enforcement, the Victim's mother texted "Raul" the PIN number for the funds. However, he was intentionally provided with a PIN number that was off by one digit to allow representatives from Money Gram who were cooperating with law enforcement, to provide the location where he was retrieving the funds.

11. Thereafter, during a monitored phone call, "Raul" spoke to the Victim's mother and informed her that the PIN number was not working. At the direction of law enforcement, the Victim's mother then provided him the correct number. "Raul" then went back to the line at the Wal-Mart in Weslaco, Texas and law enforcement received notification from Money Gram that he had successfully obtained the $1500.

12. Later, during a monitored phone call, "Raul" called the Victim's mother and inquired how long until the Victim would be picked up. He stated that if something didn't work out, call him, and he would come back to get the Victim. He stated that he had to go and "move the other people."

13. Agents and Task Force Officers in Texas advised that after "Raul" left the Wal-Mart, he tried to take the Victim with him when he left and was immediately arrested. He was later identified as JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul."

14. The Victim was then interviewed regarding the whereabouts of where she was being held. She was able to lead law enforcement to the location where she was being held.

15. After being advised of his Miranda rights, JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," the defendant, stated, among other things, that: (1) he was working with "Alejandro" in Mexico; (2) he made the phone calls to obtain money to move the Victim; (3) the Victim was held five or six days; (4) $1500 of the money on his person was for alien smuggling; and (5) he is a citizen of Mexico.

16. JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul," the defendant, consented to a search of the structure that the Victim identified as the Bodega. Inside a decrepit structure filled with trash, law enforcement officers found three individuals who were citizens of foreign countries including a minor female.

WHEREFORE, the deponent respectfully requests that JUVENCIO MARTINEZ-MARTINEZ, a/k/a "Raul,", the defendant, be imprisoned or bailed, as the case may be.

_____
LYONEL MYRTHIL
Special Agent
Federal Bureau of Investigation

Sworn to before me this
16th day of May, 2014.

_____
THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK